# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JOSEPH F. PACCONI, JR.,        )
                              )
         Plaintiff,       )
                              )
        v.            )    02: 05cv1488
                              )
TRUSTEES OF THE UNITED MINE    )
WORKERS OF AMERICA, HEALTH AND  )
RETIREMENT FUND OF 1974; MICHAEL  )
H. HOLLAND; MICHAEL W. BUCKNER;  )
STEVEN F. SCHAAB; and B.V. HYLER,  )
                              )
        Defendants.     )

## MEMORANDUM OPINION AND ORDER

October 26, 2006

Presently pending before the Court for disposition are the MOTION FOR SUMMARY JUDGMENT, with brief in support, filed by Defendants, Trustees of the United Mine Workers of America, Health and Retirement Fund of 1974; Michael H. Holland; Michael W. Buckner; Steven F. Schaab; and B.V. Hyler (collectively referred to as the "Trustees") (*Document Nos. 9 and 10)* and the MOTION FOR SUMMARY JUDGMENT, with brief in support, filed by Plaintiff, Joseph F. Pacconi, Jr. ("Plaintiff") (*Document Nos. 12 and 13*).

After careful consideration of the parties' cross motions for summary judgment, the filings in support and opposition thereto, the memoranda of the parties, the relevant case law, and the record as a whole, the Court finds that there is not sufficient record evidence upon which a reasonable factfinder could return a verdict for Plaintiff on his claim under the Employment Retirement Income Security Act of 1974 ("ERISA") that his request for disability pension benefits was improperly denied by the Trustees. There is, however, sufficient record

evidence to support the Motion for Summary Judgment filed by the Trustees.  Therefore, the

Court will grant the Motion for Summary Judgment filed by the Trustees and deny the Motion

for Summary Judgment filed by the Plaintiff.

### Summary Judgment Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure reads, in pertinent part, as

follows:

> [Summary Judgment] shall be rendered forthwith if the pleadings, depositions,
> answers to interrogatories and admissions on file, together with the affidavits, if any,
> show that there is no genuine issue as to any material fact and that the moving party
> is entitled to judgment as a matter of law.

 In interpreting Rule 56(c), the United States Supreme Court has stated:

> The plain language . . . mandates entry of summary judgment, after adequate time for
> discovery and upon motion, against a party who fails to make a showing sufficient to
> establish the existence of an element essential to that party's case, and on which that
> party will bear the burden of proof at trial.  In such a situation, there can be no
> genuine issue as to material fact, since a complete failure of proof concerning an
> essential element of the non-moving party's case necessarily renders all other facts
> immaterial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

An issue of material fact is genuine only if the evidence is such that a reasonable jury

could return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248 (1986).  The Court must view the facts in a light most favorable to the non-moving party

and the burden of establishing that no genuine issue of material fact exists rests with the

movant.  *Id.* at 242.  The "existence of disputed issues of material fact should be ascertained by

resolving all inferences, doubts and issues of credibility against the moving party."  *Ely v. Hall's*

*Motor Transit Co.*, 590 F.2d 62, 66 (3d Cir. 1978) (*quoting Smith v. Pittsburgh Gage & Supply Co.*, 464 F.2d 870. 874 (3d Cir. 1972)).  Final credibility determinations on material issues cannot be made in the context of a motion for summary judgment, nor can the district court weigh the evidence.  *Josey v. Hollingsworth Corp.*, 996 F.2d 632 (3d Cir. 1993); *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224 (3d Cir. 1993).

When the non-moving party will bear the burden of proof at trial, the moving party's burden can be "discharged by `showing' -- that is, pointing out to the District Court -- that there is an absence of evidence to support the non-moving party's case."  *Celotex*, 477 U.S. at 325.  If the moving party has carried this burden, the burden shifts to the non-moving party who cannot rest on the allegations of the pleadings and must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Petruzzi's IGA Supermarkets*, 998 F.2d at 1230.  When the non-moving party's evidence in opposition to a properly supported motion for summary judgment is "merely colorable" or "not significantly probative," the court may grant summary judgment.  *Anderson*, 477 U.S. at 249-50.

## BACKGROUND

As the law requires, all disputed facts and inferences are resolved most favorable to the Plaintiff, Joseph F. Pacconi, Jr.  Plaintiff began working in the coal mines as a United Mine Workers of America ("UMWA") represented employee in 1970.  Plaintiff continued to work in the mines until he was laid off on January 14, 2000.  On June 20, 2003, Plaintiff applied for a disability pension from the UMWA 1974 Pension Trust, one of several employee benefit trusts

that are collectively referred to as the UMWA Health and Retirement Funds.  On May 15, 2005, a disability pension analyst concluded that Plaintiff did not meet the criteria for qualification of a disability pension.  On June 16, 2005, Plaintiff's attorney submitted additional information to the Trustees for their consideration during the administrative appeal of Plaintiff's disability pension denial.  On October 13, 2005, the Trustees informed Plaintiff that they had reaffirmed their denial of his disability pension application.

On October 26, 2005, Plaintiff filed a Complaint in this Court in which he alleges wrongful denial of disability pension benefits against Defendant Trustees under ERISA, 29 U.S.C. § 1001, *et seq.*  The parties have filed cross-motions for summary judgment which concern the denial of Plaintiff's claim for disability pension benefits.  The central issue in this case is whether the Trustees acted in an arbitrary and capricious manner when they denied Plaintiff's application for disability pension benefits.

*The UMWA 1974 Pension Trust ("1974 Pension Trust")*

The 1974 Pension Trust was established pursuant to the National Bituminous Coal Wage Agreement of 1974 and in accordance with Section 302(c) of the Labor-Management Relations Act of 1947, 29 U.S.C. § 186(c).  Article II.C of the 1974 Pension Plan provides, in pertinent part, as follows:

> A participant who (a) has at least 10 years of signatory service prior to retirement, and (b) becomes totally disability **as a result of a mine accident** . . . shall, upon retirement (herein after "Disability Retirement"), be eligible for a pension while so disabled.  A Participant shall be considered to be totally disabled only if by reason of such accident such Participant is subsequently

4

determined to be eligible for Social Security Disability Insurance Benefits under
Title II of the Social Security Act or its successor.

*Article II.C., 1974 Pension Plan, Ex. B at 5 (emphasis added).*

Pursuant to the authority granted the Trustees in Article VIII.B.(1) of the 1974 Pension
Plan, the Trustees have developed a series of interpretative guidelines called "Questions and
Answers" ("Q&A") to assist them in interpreting the provisions of the Plan in a uniform and
consistent manner.  In particular, the Trustees have adopted Q&A 252, which provides that a
miner is totally disabled as a result of a mine accident if there is:

> (1)  Unexpectedness:  The disability must have been unlooked for and
> unforeseen; (2)  Definiteness: The disability must be traceable to a definite time,
> place and occasion which occurred within the course of the mine worker's
> employment.  A progressive disease does not meet this test and therefore cannot
> be a disability that resulted from a mine accident; (3)  Force or Impact:  The
> disability must have been caused by the exertion or impact of some external
> physical force or object against the body or by the exertion or impact of the body
> against some external physical object; i.e. not simply the result of the mine
> worker's own physical condition.
>                                                              . . .
>
> As indicated above, however, miners who become disabled by progressive
> diseases or conditions such as . . . arthritis . . . cannot be considered "disabled as
> the result of a mine accident" under the test stated above.

*Exhibit B.*

Therefore, pursuant to Article II.C of the Plan, and Q&A 252, in order to be eligible for
disability pension benefits under the 1974 Pension Plan, an applicant must establish that (i) he
is totally disabled as demonstrated by a Social Security Disability Income ("SSDI") award; (ii)
he must have suffered a mine accident as defined under the terms of the Plan; and (iii) the mine
accident must be the cause of his disability.   The 1974 Pension Trust "provides disability
benefits only when the applicant has carried his burden of proving that a mine accident either

directly caused his disability or caused his disability by substantially aggravating a pre-existing condition." *Fotta v. Trustees of the UMWA Health & Ret. Fund of 1974*, 319 F.3d 612, 617 (3d Cir. 2003).

The Trustees do not dispute that (i) Plaintiff received an SSDI award or (ii) that Plaintiff was in several mine accidents.  However, it is the position of the Trustees that Plaintiff has failed to demonstrate that a mine accident substantially caused his disability.

*Work-Related Injuries*

The administrative record reflects that Plaintiff has suffered a number of work-related injuries.   The first reported work-related injury in the administrative file indicates that Plaintiff sustained a back strain on January 21, 1981.  The record further reflects that Plaintiff worked on January 23, 1981.

From March 9, 1985 until July 15, 1985, Plaintiff was off work due to a back strain he sustained while lifting a cement block.

On June 10, 1986, Plaintiff stepped on a mud-covered block, which caused him to fall and injure his right foot and back.  He was off work from June 11, 1986 to April 27, 1987, as a result of his injuries.

From January 10, 1993 until April 12, 1993, Plaintiff was off work due to a sprain/strain of his neck which resulted when a piece of a rock fell and hit him on top of his hard hat.

On May 23, 1995, Plaintiff filed an accident report in which he reported that he felt pain in his back when he "was jacking up a long supply car onto the track."  He missed no work for this injury.

6

On June 29, 1995, Plaintiff injured his right shoulder and neck areas when he was helping a coworker move a piece of equipment onto a mine car.

On August 12, 1996, Plaintiff sustained a sprain/strain to his ankle when he "was running a scoop which hit a pothole causing him to strike his head on the canopy."  According to the accident report, Plaintiff missed no work for this accident.

On June 11, 1997, Plaintiff "stepped on a 4" x 4" piece of rock twisting his right ankle." The accident report indicates that Plaintiff missed no work as a result of this accident.

On November 6, 1997, Plaintiff again injured his ankle at work when he stepped on a piece of stone and twisted his ankle.  The record reflects that Plaintiff missed no work as a result of this injury.


*Medical Reports and Records (1998 - August 2001)*

In January 1998, Paul D. Burton, D.O., Plaintiff's treating physician, recommended that Plaintiff consult a specialist in cervical instability.  On February 27, 1998, Plaintiff was seen by Jeffrey A. Baum, M.D.  At that time, Plaintiff reported headaches, migraines, and a stiff neck while working, but reported that he had no significant symptoms while not working.  Dr. Baum reviewed Plaintiff's medical history, including x-rays, CT scans, and MRIs of his cervical spine, and found that there were "very mild changes of degenerative disc disease but overall, his alignment is normal and no changes in the soft tissue to suggest any compromise there."  The medical records of Dr. Baum also indicate that Plaintiff told him that the company doctor did not believe that the injury was work related and that Plaintiff inquired "whether or not he could go on disability from this mining injury."  Dr. Baum opined that given Plaintiff's range of

motion in his neck and good neurological exam, he thought that Plaintiff "would have a hard time going on disability from this mine related accident."  Dr. Baum also recommended that Plaintiff get a whole body bone scan to look for any occult injuries in his neck.

On March 26, 1998, Dr. Burton examined Plaintiff and found that Plaintiff's right ankle and neck continued to bother him.  Dr. Burton diagnosed "[c]ervical pain with possible component of mild cervical instability at C3-C4 and early spondylosis of the cervical spine" as well as "[c]hronic lateral ankle instability."

On April 1, 1998, Plaintiff had a whole body bone scan which revealed findings consistent with degenerative changes in his cervical spine.

On May 5, 1998, Plaintiff saw Dr. Burton for complaints of weakness and giving way of his right ankle and back pain.  Dr. Burton's diagnosis was "[c]hronic instability right ankle with a previous ankle sprain" and "[n]eck pain most likely secondary to osteoarthritis in the cervical spine" as noted in the tomograms.  Dr. Burton recommended a surgical procedure to reduce ankle instability and possibly a tendon augmentation process.  On that same day, Dr. Burton wrote Dr. Baum and reiterated his conclusion that the tomograms revealed arthritis with degenerative changes to Plaintiff's cervical spine.

Plaintiff worked until Dr. Burton operated on his ankle on May 18, 1998.  On May 26, 1998, Plaintiff returned to Dr. Burton for a post-operative examination, at which time Dr. Burton noted that Plaintiff was progressing normally.  On July 28, 1998, Dr. Burton evaluated Plaintiff and recommended a course of physical therapy.  From July 28, 1998 to November 12, 1998, Plaintiff received physical therapy for his right ankle during which time he reported pain

and continued ankle instability.  On August 11, 1998, and again on September 22, 1998, Dr. Burton found that Plaintiff was unable to return to work.

On November 17, 1998, Dr. Burton prescribed a more aggressive physical therapy program.  Dr. Burton recommended that Plaintiff continue with this aggressive therapy for six weeks after which time he would recommend additional surgery if Plaintiff was continuing to experience ankle instability.  From November 17, 1998, until January 4, 1999, Plaintiff underwent the more aggressive physical therapy.

On January 5, 1999, Dr. Burton recommended a more comprehensive lateral ankle ligament reconstruction.  Surgery was scheduled for February 24, 1999.  Dr. Burton's prognosis post surgery was fair to good.  Plaintiff attended physical therapy from May 17, 1999 until September 8, 1999.

Dr. Burton's office record of September 2, 1999, reflects that Plaintiff had made good progress and would be returned to regular duty on September 13, 1999.

On September 9, 1999, Plaintiff was examined by Ki Y. Chung, M.D., and found to be fit for duty, without restrictions.  On October 21, 1999, Thomas J. Neilson, M.D., medical director for Consol Inc., completed a fitness- for- duty medical examination of Plaintiff and noted the following:  elevated blood pressure, abnormal urinalysis, overweight, tobacco abuse, early indications of high frequency hearing deficit.  Significantly though, Dr. Neilson noted no problems with Plaintiff's ankle, back or neck.

On December 29, 1999, Plaintiff returned to Dr. Burton for a reassessment of his right ankle.  Dr. Burton observed that Plaintiff was able to work although his ankle continued to

"ache on and off."  Additionally, Dr. Burton noted that some of the ankle stiffness may be the result of post-traumatic arthritic changes to his ankle.

Plaintiff continued to work until he was laid off on January 14, 2000.  On June 20, 2000, Plaintiff saw Dr. Burton and reported that he had no "giving way episodes" in his ankle and that he was taking no pain medications.  Dr. Burton noted that Plaintiff's continuing pain in his ankle most likely had to do with early arthritic changes.

On September 28, 2000, Plaintiff was examined for a disability assessment by Durre Ahmed, M.D.  Upon examination, Plaintiff complained of neck pain, back pain, ankle pain, and numbness in his left arm.  Dr. Ahmed concluded that Plaintiff suffered from possible degenerative joint disease and neck pain most likely due to degenerative disc disease.  Lastly, Dr. Ahmed found that Plaintiff may have problems performing work that involved frequent bending of the neck or heavy lifting because of his "degenerative joint disease."

Dr. Burton's records of December 19, 2000, reflect a diagnosis of chronic right ankle pain, most likely early secondary osteoarthritis, history of chronic right ankle instability, and neck pain with spondylosis of the cervical spine and facet arthritis.  Dr. Burton opined that Plaintiff was unable to return to his work responsibilities.  Plaintiff was referred to Jagadeesha N. Shetty, M.D., for evaluation of his neck.

On January 23, 2001, Plaintiff saw Dr. Shetty and presented with complaints of neck pain.  Dr. Shetty's impression was that Plaintiff was suffering from "cervical spondylosis" and left-sided myofacial pain involving the trapezius muscle.  On February 27, 2001, Plaintiff again saw Dr. Shetty who repeated his diagnosis of cervical spondylosis and also noted that Plaintiff was experiencing significant relief of symptoms with the use of a TENS unit.

On July 17, 2001, Plaintiff returned to Dr. Burton with complaints of right ankle pain, right elbow pain, numbness and tingling of right ring and small finger, and chronic neck pain. An x-ray revealed degenerative changes to the ankle.  Dr. Burton's diagnosis for the ankle pain was "[c]hronic right ankle pain with secondary arthritis with a history of numerous previous ankle sprains with a previous ankle reconstruction procedure."  Dr. Burton found that Plaintiff's neck pain came from spondylosis.

On August 24, 2001, Dr. Burton found that the tingling in Plaintiff's fingers was consistent with moderate carpel tunnel syndrome and was probably caused by his many years of work in the coal mines.


*August 26, 2001 Motor Vehicle Accident and Subsequent Medical Treatment*

On August 26, 2001, Plaintiff was involved in a motor vehicle accident in which he was struck from behind while stopped to turn left by a car traveling at 60 mph.  Plaintiff suffered whiplash as a result of the accident.  He also reported pain and tingling in all his fingers as well as neck pain and headaches following the accident.  He had significantly limited range of motion in his neck in all directions.  From August 2001 through March 2002, Plaintiff attended physical therapy for his whiplash injury.

On September 21, 2001, Plaintiff returned to Dr. Shetty with complaints of neck pain and right upper extremity radicular pain.  Dr. Shetty ordered an MRI for Plaintiff's lumbar and cervical spine to rule out herniated discs.

On October 2, 2001, Plaintiff was reevaluated by Dr. Shetty who noted that the MRI reflected only osteophytosis at C4-C5.  Dr. Shetty characterized the results as "C4-C5

11

degenerative disc disease with osteophytosis." Dr. Shetty's clinical impression was whiplash injury.

On November 1, 2001, Plaintiff saw Joseph Macchiaroli, M.D., for a series of cervical epidural steroid injections to alleviate his neck pain. The medical record evidence reflects that Plaintiff had his first injection on November 7, 2001, and reported significant improvement after the injection.

On November 21, 2001, Plaintiff returned to Dr. Shetty with reports of neck and low back pain. Dr. Shetty reported that an MRI of Plaintiff's lumbar spine identified a generalized disc bulge and severe degenerative disc disease L4-L5 and multi-level osteophytosis. Dr. Shetty recommended continuing with the epidural injections.

On December 12, 2001, Plaintiff returned to Dr. Shetty with complaints of neck and low back pain with numbness of the right lower extremity. Dr. Shetty recommended that Plaintiff have epidural injections in his lower back as well. Dr. Shetty's impression was degenerative disc disease.

Dr. Shetty's office records from December 26, 2001, reflect that Plaintiff had persistent neck and low back pain since his motor vehicle accident on August 26, 2001, and was not making much improvement. Diagnoses was listed as neck pain, whiplash injury, and multilevel bulged disc in the lumbar spine.

On January 9, 2002, Dr. Burton performed carpal tunnel release surgery on Plaintiff. In March 2002, Dr. Burton noted that Plaintiff was making slow and steady progress with respect to his whiplash injuries to his neck and back.

On June 28, 2002, Plaintiff returned to Dr. Burton with complaints of right ankle pain. Dr. Burton diagnosed the following conditions: chronic ankle pain with secondary arthritis; paresthesis in the right ulnar nerve; previous carpal tunnel syndrome; chronic neck pain with spondylosis; chronic low back pain with spondylosis. Dr. Burton also noted that Plaintiff was unable to work at that time.

On July 10, 2002, Plaintiff returned to Dr. Shetty with complaints of chronic neck pain, chronic low back pain, right hand pain, and right little finger numbness. Upon examination, Dr. Shetty concluded that Plaintiff's "degenerative changes in his lower back is (sic) unlikely to get any better, it is a progressive disorder" and that Plaintiff was unlikely to "get into any gainful employment considering his functional limitations."

On November 8, 2002, Plaintiff reported to Dr. Burton that eight (8) days before he had fallen and felt a "rip" in his arm. Dr. Burton diagnosed partial tear in Plaintiff's biceps tendon.

On January 2, 2003, Plaintiff returned to Dr. Burton with complaints of right ankle and foot pain. Dr. Burton found that Plaintiff had plantar fibromatosis as well as chronic ankle pain with probable secondary arthritis. He opined that Plaintiff was unable to return to work "due to his foot problems."

*The Social Security Disability Income Benefits Award*

Plaintiff filed an application for SSDI benefits on June 20, 2000.[1] An Administrative Law Judge ("ALJ") issued an unfavorable decision to Plaintiff on April 24, 2001, which

---

[1]     The alleged onset date of disability listed on the SSDI application is not included in the administrative record.

decision was upheld by the Appeals Council on May 31, 2002.  On August 23, 2003, the United States District Court for the Western District of Pennsylvania found that the Commissioner's decision was supported by substantial evidence and affirmed the decision.

While the denial of his initial application was pending review in the District Court, Plaintiff filed another application for SSDI benefits in which he alleged an onset date of disability of August 26, 2001, the date of his motor vehicle accident.  On April 30, 2003, the ALJ awarded Plaintiff SSDI benefits.  The ALJ found that Plaintiff became disabled on August 26, 2001.  The ALJ concluded that Plaintiff had the following severe impairments: degenerative disc disease of the lumbar spine; partial tear of the left bicep tendon; bilateral plantar fibrosis; right ankle pain-status/post ankle reconstruction; bilateral foot pain; right ulnar neuritis; right hand carpal tunnel syndrome with release in January 2002; degenerative joint disease of the cervical spine with probable herniated disc at C3-4 and C4-5, following a motor vehicle accident on August 26, 2001.

*Disability Pension Application*

On June 20, 2003, Plaintiff filed a disability pension application with the UMWA Health and Retirement Funds.  He claimed disability based on chronic right ankle pain, ruptured disc in lower back, carpel tunnel syndrome, neck pain, and shoulder pain.  On September 16, 2004, the Trustees notified Plaintiff that his disability pension application had been denied because he had not established that a mine accident caused the disability.

Martha Kinsey, R.N., a disability pension analyst, provided Plaintiff with a detailed review of the evidence in his file along with the reasons that the Trustees had determined that

14

Plaintiff had failed to show that his disability was the result of a mine accident.  Ms. Kinsey discussed each of Plaintiff's SSDI impairments and explained her conclusion that none of the impairments was caused by a mine accident.

On October 5, 2004, Plaintiff's attorney requested a copy of the administrative record and an immediate hearing on the merits.  He also submitted additional information which he claimed demonstrated that Plaintiff's disability was the result of a mine accident.

A pre-hearing conference concerning the denial of benefits was held by telephone on February 3, 2005.  At that hearing, Plaintiff's attorney submitted additional evidence to refute the Trustee's conclusion that the medical evidence in the file failed to establish that Plaintiff's disability was the result of a mine accident.  On February 7, 2005, Plaintiff was notified  that his pension file had been forwarded to medical staff for an independent review.

On May 11, 2005, Patricia King, R.N., a disability pension analyst, independently concluded that the evidence in the record failed to demonstrate that a mine accident caused Plaintiff's disability.  In particular, Ms. King observed that one of Plaintiff's SSDI impairments was degenerative disc disease and degenerative joint disease of the cervical spine which is a progressive condition not the result of one specific event such as a  mine accident.  She also noted that another of Plaintiff's impairments was a left biceps tear which occurred in November 2002, almost two years after Plaintiff had been laid off from work.

In addition, Ms. King found that Plaintiff's impairment based on plantar fibrosis was not the result of a mine accident and that his right ulnar neuritis also lacked a connection to a mine accident because the first documented complaint or treatment to the right elbow occurred in July 2001, again after Plaintiff was no longer working in the mines.

15

Similarly, Ms. King found that Plaintiff's carpal tunnel syndrome was not the result of a specific mine accident. With respect to Plaintiff's ankle problems, Ms. King noted that Plaintiff's surgical procedures were performed in May 1998 and February 1999, and that Plaintiff returned to work after the surgeries and worked until he was laid off in January 2000. Finally, Ms. King concluded that the injuries Plaintiff sustained in the motor vehicle accident could not be considered the result of a mine accident.

On June 16, 2005, Plaintiff's attorney again submitted additional information to the Trustees for consideration during the administrative appeal.

On October 13, 2005, the Trustees informed Plaintiff that they had reaffirmed their denial of his disability pension application because he had failed to demonstrate that a mine accident caused his disability.

### DISCUSSION

A.   *Plaintiff's Claim for Disability Pension Benefits*

1.   <u>Standard of Review for a Benefits Denial under ERISA</u>

A claim for benefits under ERISA, § 502(a)(1)(B), must be brought against the plan itself or the administrator with discretionary authority and responsibility for the denial of the claim. *See 29 U.S.C. § 1132(d)(2).*  Although ERISA does not provide the standard of review for an action by a participant alleging that he has been denied benefits, in *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101 (1989), the United States Supreme Court held that the appropriate standard for actions which challenge denials of benefits is a *de novo* standard unless the plan gives the "administrator or fiduciary discretionary authority to determine eligibility for

16

benefits or to construe the terms of the plan" in which case an abuse of discretion standard is appropriate.  *See Mitchell v. Eastman Kodak Co.,* 113 F.3d 433, 437 (3d Cir. 1997) (citing *Firestone,* 489 U.S. at 115).

According to the United States Court of Appeals for the Third Circuit, this standard is "essentially the same as the 'abuse of discretion' standard." *Abnaytha v. Hoffman-LaRoche, Inc.,* 2 F.3d 40, 45 n. 4 (3d Cir.1993). The court of appeals further stated with respect to the "arbitrary and capricious" standard:

> [A]n administrator's decision will only be overturned if it is without reason, unsupported by substantial evidence, or erroneous as a matter of law. . . . [T]he court is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits.

*Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d 377, 387 (3d Cir. 2000).

In the instant case, the parties do not dispute that the Trustees had discretionary authority to determine whether Plaintiff qualified for benefits.  However, the parties disagree over what standard of review applies.  Plaintiff argues that a heightened standard of review is warranted because "there were a number of procedural anomalies present in this case . . . ." The Trustees argue that the arbitrary and capricious standard should apply.

According to Plaintiff, a heightened standard of review is warranted because the Trustees failed to conduct a hearing on the merits of his claim during the administrative process and "the wanton and wilful disregard of evidence, specifically, in regards to the impairment of right ankle pain/status post ankle reconstruction and in regards to the work injuries to Pacconi's back in March of 1985 and June 10, 1985."  Pl's Br. at 11.   In response, the Trustees contend that a heightened standard of review is not warranted because (i) "neither ERISA nor the 1974

17

Pension Plan require a live hearing as part of the administrative review process;" and (ii) the Trustees did not disregard the evidence, rather Plaintiff was provided with "three separate independent reviews of the available evidence with detailed written analysis of the reasons for the denial.  They also provided a telephonic conference, in which Pacconi's attorney participated, during which the basis for the denial was explained and additional information was solicited."  Def's Br. at 2.

The Court finds and rules that other than Plaintiff's own bare assertion that "there were a number of procedural anomalies present in the case," the Court finds that the administrative record does not contain evidence of procedural anomalies that have prompted other courts to apply a substantially heightened review standard.  Accordingly, the Court will apply an arbitrary and capricious standard of review of the Trustees' denial of Plaintiff's disability pension benefits under the 1974 Pension Plan.

2.      The Merits of the Denial of Benefits

Plaintiff's Motion for Summary Judgment relies almost exclusively on the opinions of his treating physicians for the conclusion that he was wrongly denied disability pension benefits.  The Trustees counter that they exercised the discretion vested in them under the ERISA plan in question and they concluded, based on the record evidence before them, that Plaintiff had failed to carry his burden of demonstrating that his disability was substantially caused by a mining accident.

18

In this case, the Trustees provided Plaintiff with three separate independent reviews of the available evidence with detailed written analysis of the reasons for the denial.  Plaintiff was also provided a telephonic conference, in which his attorney participated, during which the basis for the denial was explained and additional information was solicited.

The Court finds and rules that the decision of the Trustees to deny benefits is supported by substantial evidence in the record.  Without doubt, Plaintiff sustained a number of mine accidents; however, the record supports the Trustees' decision that Plaintiff failed to demonstrate a causal connection between any of these mine accidents and his ultimate disability.  Significantly, Plaintiff has failed to rebut the fact that the 1974 Pension Plan, as the Trustees have interpreted it pursuant to Q&A 252, does not consider degenerative conditions, such as the lumbar and cervical disc disease that Plaintiff suffers from, to be the result of a mine accident.  Additionally, the Court notes that the Trustees' interpretation of Q&A 252 has been upheld by numerous courts, *to wit*:  *McCoy v. Holland*, 364 F.3d 166, 172 (4th Cir. 2004); *Vance v. Holland,* 22 F. Supp. 2d 529, 533 (W.D. Va. 1998), *aff'd,* No. 98-2637, 1999 WL 176469 (4th Cir. March 31, 1999); *Brogan v. Holland,* 105 F.3d 158, 162 (4th Cir. 1997); *Moats v. UMWA Health and Retirement Funds*, 981 F.2d 685, 688 (3d Cir. 1992).

Furthermore, the record reflects that most of Plaintiff's disabling medical conditions have no possible connection to a mine accident because they either arose after Plaintiff ceased working in the mines or the record lacks evidence to connect them to a mine accident, *to wit*: bilateral plantar fibrosis; bilateral foot pain; partial tear of the left bicep; right ulnar neuritis; right hand carpal tunnel syndrome which was released in January 2002; and herniated disc at C3-4 and C4-5, following a motor vehicle accident on August 26, 2001.

19

As to Plaintiff's disabling back and neck conditions, the record in this case contains many references to the degenerative nature of these problems.  For example, Dr. Shetty concluded that Plaintiff's "degenerative changes in his back is (sic) unlikely to get any better, it is a progressive order."  Likewise, Dr. Burton concluded that Plaintiff's tomograms showed arthritis with degenerative changes to Plaintiff's cervical spine.  Dr. Ahmed also opined that Plaintiff may have problems performing work that involved frequent bending of the neck or heavy lifting because of his "degenerative joint disease."   In light of this record, the Court finds and rules that the Trustees' conclusion that Plaintiff's lower back and cervical problems are the result of progressive degenerative changes to his spine that are not fairly traceable to a specific mine accident or accidents is amply supported by the record.

Finally, as to Plaintiff's disabling ankle condition, the administrative record reflects that Plaintiff had numerous ankle sprains.  However, Dr. Burton attributed Plaintiff's chronic ankle pain and stiffness to degenerative arthritic changes, which would render the ankle condition ineligible for consideration under Q&A 252.

Having rejected Plaintiff's principal argument, the Court now addresses the other contentions in a more summary fashion.  None of these subsidiary arguments are meritorious.  First, Plaintiff argues that the term "mine accident" is unambiguous and asks the Court to reject the interpretation of the 1974 Pension Plan as set forth in Q&A 252.  However, Plaintiff fails to recognize that the United States Court of Appeals for both the Third and Fourth Circuits has approved of this interpretation.  *See, e.g., McCoy v. Holland*, 364 F.3d 166, 172 (4th Cir. 2004); *Vance v. Holland,* 22 F. Supp. 2d 529, 533 (W.D. Va. 1998), *aff'd,* No. 98-2637, 1999 WL 176469 (4th Cir. March 31, 1999); *Brogan v. Holland,* 105 F.3d 158, 162 (4th Cir. 1997);

*Lockhart v. UMWA Health and Retirement Funds,* 5 F.3d 74, 78-79 (4th Cir. 1993); *Moats v. UMWA Health and Retirement Funds,* 981 F.2d 685, 688-89 (3d Cir. 1992).  Based on this authority, the Court will uphold the Trustees' interpretation of the term "mine accident" as stated in Q&A 252.

Next, Plaintiff argues that the term "mine accident" should include all work injuries as defined under Pennsylvania's Workers Compensation Act.  However, the 1974 Pension Plan does not include any reference to state workers' compensation standards and, consequently, numerous courts, including the Court of Appeals for the Third Circuit, have found that the Trustees are not bound by state workers' compensation determinations.  *See Moats,* 981 F.3d at 689;  *Hale v. Trustees of the UMWA Health & Retirement Funds*, 23 F.3d 899, 902 (4th Cir. 1994) ("[a]bsent a plan provision expressly adopting workers' compensation standards, the Trustees are not bound by [plaintiff's] receipt of workers' compensation benefits in deciding whether she was disabled in a mining accident."  Given this authority, the Court finds that Plaintiff's argument that the term "mine accident" should include all injuries recognized as "work injuries" under the Pennsylvania Workers Compensation Act is without merit.

Lastly, Plaintiff argues that the eligibility criteria of 1974 Pension Plan are ambiguous because an SSDI award does not state whether it was obtained by reason of a mine accident. Under the 1974 Pension Plan, the Trustees are obligated to treat the recipient of an SSDI award as disabled without further question.  However, the Trustees must conduct a thorough and independent review to determine whether a mine accident substantially caused the applicant's disability.  Numerous courts, including the Court of Appeals for the Third Circuit, have concluded that the Trustees have a responsibility for deciding the issue of causation

21

notwithstanding the binding presumption of disability that follows the receipt of an SSDI

award.  *McCoy*, 364 F.3d at 170; *Fotta,* 319 F.3d at 617-18; *Moats*, 981 F.2d at 689 n.3 ("[t]he

UMWA Plan provides that receipt of [SSDI] benefits conclusively establishes total disability . .

. but the plan does not provide - and it would be nonsensical to provide - that the receipt of such

benefits establishes that the recipient was injured in a 'mine accident.' "  Therefore, the Court

finds and rules that the Trustees have the discretionary authority to determine whether a mine

accident caused the applicant's disability.


## Conclusion

For the hereinabove stated reasons, the Court finds and rules that the decision to

deny the Plaintiff's application for disability pension benefits was not arbitrary and capricious.

Therefore, the Trustees are entitled to summary judgment as a matter of law.

An appropriate Order follows.


McVerry, J.


22

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JOSEPH F. PACCONI, JR.,        )
                                  )

           Plaintiff,          )
                                  )

          v.               )      02: 05cv1488
                                  )

TRUSTEES OF THE UNITED MINE     )
WORKERS OF AMERICA, HEALTH AND  )
RETIREMENT FUND OF 1974; MICHAEL  )
H. HOLLAND; MICHAEL W. BUCKNER;  )
STEVEN F. SCHAAB; and B.V. HYLER,  )
                                  )

          Defendants.       )

### ORDER OF COURT

AND NOW, this 26th day of October, 2006, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED AND DECREED** as follows:

(1) The Motion for Partial Summary Judgment filed by Plaintiff, Joseph F. Pacconi, Jr., is **DENIED**; and

(2) The Motion for Summary Judgment filed by Defendants, Trustees of the United Mine Workers of America, Health and Retirement Fund of 1974; Michael H. Holland; Michael W. Buckner; Steven F. Schaab; and B.V. Hyler, is **GRANTED**.

The clerk shall docket this case closed.

BY THE COURT:

s/Terrence F. McVerry
United States District Court Judge

cc:     Brian Patrick Bronson, Esquire
        QuatriniRaffertyGalloway
        Email: BPB@qrglaw.com

        Ralph A. Finizio, Esquire
        Pepper Hamilton
        Email: finizior@pepperlaw.com